1
2
3
4

IN THE UNITED STATES DISTRICT COURT

5

FOR THE NORTHERN DISTRICT OF CALIFORNIA

6
7

DURELLE CRAWFORD,

8              Petitioner,                    No. C 08-5627 CRB (PR)

9       v.                                    ORDER DENYING PETITION FOR WRIT
                                              OF HABEAS CORPUS AND GRANTING
10   JOHN MARSHALL, Warden,                   CERTIFICATE OF APPEALABILITY AS
                                              TO ONE CLAIM
11              Respondent.
12   _____/

13                              **INTRODUCTION**

14          Petitioner, a state prisoner at the California Men's Colony in San Luis Obispo, seeks a writ

15   of habeas corpus under 28 U.S.C. § 2254 challenging his convictions for voluntary manslaughter

16   and attempted voluntary manslaughter, each with an enhancement for being armed with a firearm,

17   and for possession of a firearm while a ward of the juvenile court, for which he received a total

18   sentence of thirteen years.

19          Petitioner challenges his convictions on alleged improprieties in the jury instructions and jury

20   deliberation process.  For the reasons stated below, the petition for a writ of habeas corpus will be

21   denied.

22                        **PROCEDURAL BACKGROUND**

23          On June 29, 2004, an Alameda County Superior Court jury found Petitioner guilty of

24   voluntary manslaughter of Antron Crawford (no relation to Petitioner) (count 1), attempted

25   voluntary manslaughter of Vedontay Underwood (count 2) and possession of a firearm while a ward

26   of the juvenile court (count 3).  Cal. Penal Code §§ 192(a), 664, 12021(e).  (The jury found

27   Petitioner not guilty of the greater offenses of murder and attempted murder).  The jury also found

28

1  true the enhancement allegations that Petitioner was armed with a firearm, Cal. Penal Code §

2  12022(a)(1), but not true that Petitioner had discharged or made personal use of a firearm.

3       On November 9, 2004, the trial court sentenced Petitioner to thirteen years in prison.

4       On October 25, 2006, the California Court of Appeal ("Court of Appeal") affirmed the

5  judgment of the trial court. The California Supreme Court initially granted review, but ultimately

6  dismissed its grant of review on August 27, 2008.

7       On December 17, 2008, Petitioner filed a petition for a writ of habeas corpus under § 2254

8  in this Court. On March 23, 2009, this Court issued an order to show cause as to why relief should

9  not be granted. Respondent filed an answer and Petitioner filed a traverse.

10                        **FACTUAL BACKGROUND**

11       On August 1, 2001, Petitioner and two of his friends, Marques Gomer ("Marques G.") and

12  Terrance Toliver (aka "Mikey"), drove up in a car to where Antron Crawford ("Antron") and

13  Vedontay Underwood ("Underwood") were standing. The passenger side door opened, and Mikey

14  proceeded to shoot and kill Antron. Underwood was shot as well, but he survived his wounds.

15  Petitioner was charged jointly with co-defendant Marques G. The cases were severed before trial.

16  Mikey was not charged.

17       The facts were summarized by the Court of Appeal as follows:

18      At trial, the parties did not dispute that one of the victims Antron, 20 years old, had
   been in a relationship with C.P., who had given birth to their son, five months old at
19  the time of Antron's death. C.P. had broken up with Antron and started seeing
   [Petitioner], a neighbor of hers in Oakland who sometimes sold drugs out of C.P.'s
20  house. C.P. lived with her baby, her mother and her mother's boyfriend, whose
   grandson, Marques G., also frequented the neighborhood.
21
22      On July 31, 2001, Antron, accompanied by Underwood and others, visited C.P. and
   their son at her house. After a very brief visit, Antron left the house and went over
23  to [Petitioner], who was standing outside with Marques G. and others. He began
   punching and kicking [Petitioner], and Underwood joined in the assault. It was
   interrupted by officers passing by the scene.
24
25      The parties also did not dispute that [Petitioner] immediately went to Alameda to see
   Terrance T., known as Mikey, a long-time friend and heroin addict who was hiding
26  in Alameda after jumping bail, with whom [Petitioner] discussed the fight. The
   parties did not dispute that the next day, August 1, 2001, [Petitioner], although he
   owned cars himself, borrowed a girlfriend's car and had the windows tinted; that he,
27

28                         2

Marques G. and Mikey went together in the car to Antron and Underwood's neighborhood and found them together outside; that the car stopped, its passenger door opened, and Mikey fired a MAC-style automatic weapon numerous times; that a .380 pistol was also fired from the car at that time; and that Antron was killed and Underwood wounded. [Petitioner]'s girlfriend also testified that he returned the car to her and told her to have the car painted.

The parties also stipulated that [Petitioner] previously had been adjudged a ward of the juvenile court for assault with a firearm. [Petitioner] testified at trial that he had shot a stepcousin in 1996, when [Petitioner] was 15 years old, because he thought his stepcousin was going to "beat my ass or something."

The parties disagreed at trial over several key points regarding [Petitioner]'s actions, knowledge, and intent prior to and during the attack. The prosecution argued that [Petitioner] and Mikey had planned to kill Antron and Underwood in revenge for their humiliating beating of [Petitioner] the day before, and that [Petitioner] fired the .380 pistol at Antron, but missed. It presented numerous witnesses in support of its contentions, including a woman who saw a part of the shooting from her home, and preliminary hearing testimony from Underwood, who was deceased at the time of the trial from an unrelated incident. Both are discussed further, *post*.

C.P.'s aunt, who was staying in the house where C.P. lived, testified that the occupants of the house learned that Antron was outside the night of [Petitioner]'s beating. She testified that she saw [Petitioner] in the house with a gun in his hand, and that [Petitioner] said that he would shoot Antron if Antron entered the house. She testified that she did not like [Petitioner] seeing C.P.

C.P. testified that she never saw [Petitioner] with a gun, and did not remember him making such a statement that night. She also testified that [Petitioner] denied having anything to do with the shooting at first, but that he said the day before his arrest that he was sorry that he had anything to do with it and said something about asking God for forgiveness.

A former cellmate of [Petitioner]'s, George B., testified that [Petitioner] had told him different versions of what happened, including that he, [Petitioner], had been one of the shooters. [Petitioner] denied he had told George B. this, and the prosecution acknowledged in rebuttal closing argument that the cellmate's credibility was suspect.

[Petitioner]'s defense consisted principally of his own testimony. He contended that he had sworn off having or using guns after he had shot his stepcousin some years ago; had sought out Antron and Underwood solely to recover an expensive gold chain that Antron had taken from him during their fight the previous day, and to resolve the dispute between them so that they would not beat him again. [Petitioner] stated he had borrowed, tinted and driven his girlfriend's car to Antron and Underwood's neighborhood to avoid being recognized and attacked on sight; had not known or discussed with Mikey what Mikey intended to do with the two guns Mikey brought into the car, thinking he brought them for self-defense if necessary; had only driven the car; had been surprised when Mikey had started shooting; had been told by Mikey afterwards that Mikey thought he had seen someone reach for something like a gun; and saw Marques G. fire the .380 pistol, but only into the air. [Petitioner] also testified that he had smoked three to four marijuana "blunts" by the time he

1   headed over to Antron and Underwood's neighborhood, and that Mikey had snorted

2   liquid heroin as they drove.

3   The parties also disagreed about the circumstances surrounding three different

    pre-trial statements [Petitioner] had given to authorities over the course of

4   approximately two years. In his first statement, given in October 2001, [Petitioner]

    denied any involvement in the shootings. In his second statement, given in January

5   2002, he stated among other things that he was the driver and that Mikey, who wore

    a ski mask, had said that he wanted to "down one of them fools," which was slang

6   for "kill somebody." In his third statement, given more than a year later, [Petitioner]

    stated that he had driven the car, but that the plan was to recover his gold chain, that

7   Mikey had brought along guns "in case something happens," and that he did not have

    knowledge of Mikey's intent to shoot beforehand.

8   The prosecution contended that the changes in [Petitioner]'s statements tracked his

    growing knowledge of the facts and law that could implicate him in the shootings.

9   [Petitioner] testified that he had lied in his first statement, and had lied in his second

    statement in the face of coercive tactics by the interrogating police, but that he had

10  told the truth in his third statement.

11  People v. Crawford, No. A108538, 2006 WL 3493046, at **2-3 (Cal. Ct. App. Oct. 25,

12  2006).

13  **JURISDICTION AND VENUE**

14      This Court has subject matter jurisdiction over this habeas action under 28 U.S.C. § 2254 and

15  28 U.S.C. § 1331.  Venue is proper because the challenged conviction occurred in Alameda County,

16  California, which is located within this judicial district.  28 U.S.C. § 2241(d).

17  **EXHAUSTION**

18      State prisoners who wish to make a collateral challenge using habeas proceedings to either

19  the fact or length of their confinement must first exhaust all state judicial remedies. 28 U.S.C. §

20  2254(b), (c).  Petitioner satisfied the exhaustion requirement when his petition for review to the

21  California Supreme Court was dismissed on August 27, 2008.

22  **PETITIONER'S CLAIMS**

23      Petitioner claims that his Fourteenth Amendment right to due process and/or his Sixth

24  Amendment right to a jury trial were violated by the trial court's: (1) issuance of defective jury

25  instructions on attempted voluntary manslaughter; (2) issuance of a new theory of liability in the

26

27

28                                          4

1    middle of deliberations; and (3) speaking with the jury foreperson in the absence of the complete

2    jury.

3                                    **STANDARD OF REVIEW**

4          This court may entertain a petition for a writ of habeas corpus in behalf of a person in

5    custody pursuant to the judgment of a state court "on the ground that he is in custody in violation

6    of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  But under the

7    Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a habeas petition may not be

8    granted with respect to any claim adjudicated on the merits in state court proceedings unless the state

9    court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable

10   application of, clearly established federal law, as determined by the Supreme Court," 28 U.S.C. §

11   2254(d)(1), or was "based on an unreasonable determination of the facts in light of the evidence

12   presented in the state court proceeding." 28 U.S.C. § 2254(d)(2).

13         A state court decision is contrary to clearly established federal law if it "applies a rule that

14   contradicts the governing law set forth" by the Supreme Court or if it "confronts a set of facts . . .

15   materially indistinguishable from a decision of [the Court] and nevertheless arrives at a result

16   different from [that] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000).  Otherwise,

17   habeas relief may be granted if the reviewing court determines that the state court decision

18   constitutes an "unreasonable application of clearly established federal law, or [is] based on an

19   unreasonable determination of the facts." Early v. Packer, 537 U.S. 3, 11 (2002) (emphasis in

20   original) (internal quotation marks omitted).  This standard of review is highly deferential to the

21   state courts and demands that the state-court decisions "be given the benefit of the doubt."

22   Woodford v. Visciotti, 537 U.S. 19, 24 (2002); Lindh v. Murphy, 521 U.S. 320, 333 n.7 (1997).

23         Put simply, "a federal habeas court may not issue the writ simply because the court

24   concludes in its independent judgment that the relevant state-court decision applied clearly

25   established federal law erroneously or incorrectly.  Rather, that application must also be

26   unreasonable." Williams, 529 U.S. at 411.  A federal habeas court making the "unreasonable

27

28                                            5

1  application" inquiry should ask whether the state court's application of clearly established federal

2  law was "objectively unreasonable." Id. at 409.

3         For purposes of federal collateral review, the reviewing court must look beyond the summary

4  denial to the last reasoned decision as the basis for the state court's judgment. Shackleford v.

5  Hubbard, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000) (citing Ylst v. Nunnemaker, 501 U.S. 797, 803-04

6  (1991)).  In this case, we review the decision of the Court of Appeal affirming the judgment of the

7  trial court because the California Supreme Court ultimately denied review of the Petitioner's appeals

8  without comment or discussion.

9                                    **DISCUSSION**

10 **I.    ATTEMPTED VOLUNTARY MANSLAUGHTER INSTRUCTIONS**

11        Petitioner claims that the trial court's attempted voluntary manslaughter jury instructions

12 violated his rights to due process because they failed to instruct the jury that it could convict

13 Petitioner of attempted voluntary manslaughter only if it found that he specifically intended to kill

14 Underwood. Pet. at 18.  The claim is without merit because it was not objectively unreasonable for

15 the Court of Appeal to conclude that any error was harmless.

16 **A.    Background**

17        In order to convict a defendant of attempted voluntary manslaughter under California law,

18 the jury must find that the defendant harbored a specific intent to kill.  People v. Montes, 112 Cal.

19 App. 4th 1543, 1547 (2003).  A defendant cannot be convicted of attempted voluntary manslaughter

20 if he acted only in "conscious disregard for life." Id.  At the time of Petitioner's trial, Montes had

21 been decided, but the standard jury instruction for attempted voluntary manslaughter reflecting the

22 law of that decision had not been issued.

23        In the instant case, the trial court initially instructed the jury regarding voluntary

24 manslaughter, but not attempted voluntary manslaughter.  On the fourth day of deliberations, the

25 jury asked the trial court for a written statement of the law regarding attempted voluntary

26 manslaughter. The court responded by directing the jury to the voluntary manslaughter instruction,

27

28                                        6

1    CALJIC No. 8.40, it had already given them, and by providing the jury with certain instructions

2    regarding the law of attempt, including a copy of CALJIC No. 6.00.

3         The voluntary manslaughter instruction given provides in relevant part: "Every person who

4    unlawfully kills another human being [without malice aforethought but] either with an intent to kill,

5    or with conscious disregard for human life, is guilty of voluntary manslaughter . . . ." CALJIC No.

6    8.40.  The attempt instruction given provides in relevant part:  "An attempt to commit a crime

7    consists of two elements, namely, a specific intent to commit the crime, and a direct but ineffectual

8    act done toward its commission." CALJIC No. 6.00 (emphasis added).  The court reviewed its

9    response to the jury's query with counsel, who lodged no objection.

10   **B.   Court of Appeal's Opinion**

11        The Court of Appeal noted that the trial court, by referring the jury to the standard instruction

12   regarding attempt, CALJIC No. 6.00, properly informed the jurors that attempted voluntary

13   manslaughter required a specific intent to commit the crime.  But the appellate court found that the

14   trial court erred in its instructions because "it is reasonably likely that the trial court's reference at

15   the same time to CALJIC No. 8.40, the voluntary manslaughter instruction, without clarifying that

16   the 'conscious disregard for life' standard contained therein did not apply to attempted voluntary

17   manslaughter, left jurors with a mistaken impression about the standards they were to apply."

18   Crawford, 2006 WL 3493046, at *5.

19        The Court of Appeal nonetheless concluded that reversal was not in order because the  error

20   was harmless under Chapman v. California, 386 U.S. 18, 24 (1967).  Id.  The court found "beyond

21   a reasonable doubt that the trial court's instructional error regarding attempted voluntary

22   manslaughter did not contribute to the jury's verdict and, therefore, was harmless."   Id. at *12.

23        In reaching its conclusion, the Court of Appeal first considered Mikey's intent because of

24   its relevance to Petitioner's intent:

25        Although [Petitioner] does not concede that the primary shooter, who he testified was
          Mikey, fired at Underwood with the intent to kill him, there was overwhelming
26        evidence presented at trial that this was the case.

27

28                                                    7

First, Underwood's testimony was that he saw a black car with tinted windows pull up about 20 feet from Antron and him, the passenger side door open, the passenger seat go up, and an arm with an automatic gun come out, with gloves over the shooters hands. As soon as Underwood saw the gun, he turned around and ran. He heard shots as soon as he turned around, about 15 or 16 in all. He stated that six bullets struck him, with one bullet hitting him in the shoulder and five others grazing his back.

Another witness viewed a part of the shooting from her home. She testified that she heard three shots being fired, then viewed a portion of the shooting from her front window. She saw a man, whom she identified from a photograph of Underwood, running across the street into her driveway. She saw another man dressed in black and wearing something like a ski mask and gloves standing in the open door of the passenger side of a black car across the street. The man fired three or four gunshots at a man lying on the ground before getting back into the car, which sped away.

[Petitioner], although he contested a number of things recounted by these eyewitnesses, conceded in his testimony at trial that shooting began very quickly after he had stopped their car, and that there were a lot of gunshots.

The police recovered 14 nine-millimeter bullet casings at the scene of the shooting, 12 fired from one weapon and two from a second weapon. Three bullet fragments and two slugs were also located at the scene. A partial bullet slug was found in the tire rim of a bicycle near Antron's body, and an additional bullet was recovered from Antron's body. Antron died from his wound.

[Petitioner] contends that the evidence showed that the shooter did not fire with the intent to kill Antron and Underwood. He claims that Mikey lacked an intent to kill because, as [Petitioner] testified, Mikey was "blazing all over the place," bullets were sprayed haphazardly around the area, and Mikey purportedly said he was high and could have been mistaken, but he thought one of them was reaching for a gun and was about to pull something out. None of these arguments are supported by other evidence. The barrage of gunshots supports a deadly intent rather than a lesser intent to frighten. A spray of bullets is logical because the targets moved, with Underwood running across the street and into a driveway. There was no evidence presented of weapons being found at the scene.

In short, the evidence indicates that the day after Antron and Underwood attacked [Petitioner], a man in a disguise left a car immediately after it pulled up near the two, and began shooting at them repeatedly, firing at Antron while he lay on the ground, killing him, and hunted Underwood as he ran away, striking him with bullets in his shoulder and back. We cannot think of more compelling evidence which would establish that the shooter intended to kill both Antron and Underwood short of his announcement that he was going to do so. In fact, [Petitioner] told police Mikey had made such an announcement, as we discuss in the next section.

Crawford, 2006 WL 3493046, at *6 (footnote omitted).

The Court of Appeal next considered that there was a great deal of evidence showing that

Petitioner acted in a manner consistent with a specific intent to kill Antron and Underwood:

8

There was a great deal of evidence that [Petitioner] acted in a manner that was consistent with a specific intent to kill Antron and Underwood. [Petitioner] cannot contest, for example, the numerous facts indicating that he intended to attack Antron and Underwood. After he was attacked by the two, [Petitioner] immediately sought out Mikey and planned to go to High Street the very next day. Before going to High Street, he borrowed a girlfriend's car, and spent $150 to tint its windows, although he owned cars himself. He then traveled to High Street with two guns in the car, although he was aware that possession of a firearm violated the terms of his parole. [Petitioner]'s contentions that these actions were taken in anticipatory self-defense as part of a plan to attempt to recover his gold chain are incredible in light of the evidence surrounding the shootings already described above. There is no indication in the record that the jury believed these contentions; to the contrary, as discussed in the next section, the jury undoubtedly rejected a key part of [Petitioner]'s story, regarding the weapons that were brought in the car.

There was other evidence pointing to [Petitioner]'s culpability. Although he claimed he was surprised by the shooting, he did not claim to do anything to interrupt it or to attempt to aid the dying Antron; instead, he fled the scene. He then sought to conceal his participation in the shooting by, according to his girlfriend's testimony, instructing her to have her car painted, which she did. According to C.P., he later indicated that he regretted his involvement in the shooting and said something about asking God for forgiveness. In his first statement to police, he concealed his involvement by denying that he had been present at the shooting.

Furthermore, as we have already discussed, [Petitioner] gave an incriminating statement to authorities in January 2002. A few months after the shooting, while he was still at the Santa Rita jail, [Petitioner] approached jail officials and asked to speak to an investigator about the shootings. [Petitioner] contended that he wanted to "straighten out the lies" he had previously told the investigator. In the course of his subsequent interview, [Petitioner] stated, among other things, that he drove the car to the shooting, that Mikey said he wanted to "down one of them fools," which [Petitioner] said was slang for "kill somebody," and that after they drove around for about 15 minutes, "Mikey just wanted to kill anybody. Goin' 'Fuck it, if we can't find them, we just kill anybody.'" They drove to High Street to look for Antron and his friends and found them. Marques G. opened the passenger door and Mikey got out from the back seat and started shooting. [Petitioner] saw Mikey shoot his gun "hella times," saw the last bullet fired at Antron strike him in his back, and drove the car away. When asked about his intent, [Petitioner] stated, "My intent was . . . to . . . not back down from his challenge. Mikey's tryin' to put me in, not to be a punk. You know what I'm saying? I was mad at the time or whatever, but . . . ."

Thus, [Petitioner], after seeking out the investigators to give another statement, essentially confessed to assisting Mikey in a plan to kill Antron and Underwood.

[Petitioner] contends that his interviewers coerced him into telling lies in his January 2002 statement by making false promises to let him go, and causing him to believe that he would remain in jail the rest of his life if he did not follow their instructions about what to say. He argues that the jury's request for a readback of the interviewing sergeant's testimony about discussions before and after the taped portion of [Petitioner]'s statement indicates that the jury did not accept his statement at face value. However, as [Petitioner] also notes, the jury made numerous requests in the course of their deliberations, showing a commendable diligence. The jury's

9

request for a readback could have been for a variety of reasons, and proves nothing by itself.

Id. at **7-8.

The Court of Appeal also considered that the jury rejected Petitioner's primary defense that "he knew nothing about, and had nothing to do with, any plans to shoot Antron and Underwood," and instead "embraced the theory that [Petitioner], while not the shooter, acted with the shooter to kill Antron and Underwood." Id. at *8. The Court of Appeal explained:

> Specifically, the jury's determination that Petitioner was guilty of count 3, which alleged that [Petitioner] had unlawfully owned, possessed, and had custody and control of a handgun, establishes that the jury believed [Petitioner] acted in conjunction with the shooter. The court instructed the jury pursuant to CALJIC No. 12.44 that there are two kinds of possession, actual and constructive, and that constructive possession "does not require actual possession, but does require that a person knowingly exercise control over or the right to control a thing, either directly or through another person or persons." The court also instructed the jury that "[o]ne person may have possession alone, or two or more persons together may share actual or constructive possession." On June 16, 2004, just before [a] 12-day recess in jury deliberations, the jury announced that it was deadlocked on counts 1 and 2, but that it had reached a unanimous verdict on count 3, which the court ordered sealed. The jury's verdict stated that [Petitioner] was guilty in that he "did unlawfully <u>own, possess, and have custody and control</u> of a . . . handgun." This verdict can only mean that the jury rejected [Petitioner]'s story that he had nothing to do with the firearms that were used in the shooting and, instead, found that [Petitioner] owned and exercised control over these weapons. Given the overwhelming evidence that the shooter, undisputed between the parties to be Mikey, acted with the intent to kill Underwood, and that [Petitioner] took actions consistent with this same intent, we have no doubt that the jury found [Petitioner] had the specific intent to kill Underwood in the course of finding him guilty of attempted voluntary manslaughter."

Id. (emphasis in original).

The court further noted that "although the jury's guilty verdict on count 3 does not by itself establish that the jury found [Petitioner] acted with a specific intent to kill, it shows conclusively that the jury rejected [Petitioner]'s primary defense and found that he had participated in plans to shoot Antron and Underwood." Id. at *10 (footnote omitted). This determination, "combined with the overwhelming evidence that the shooter acted with the specific intent to kill and that [Petitioner] took actions and made statements consistent with that intent, lead us to conclude that the jury necessarily convicted [Petitioner] of attempted voluntary manslaughter because it believed that he had intended to kill Underwood." Id.

10

The Court of Appeal also relied on the fact that neither the prosecution nor defense counsel argued or in any way suggested that Petitioner could be convicted if Underwood was shot in conscious disregard of human life:

> [T]he arguments made by trial counsel did not in any way support a finding of guilt based on a "conscious disregard for human life." To the contrary, the prosecution's only theory was that [Petitioner] and Mikey intended to kill Antron and Underwood. [Petitioner]'s counsel, in arguing that [Petitioner] was at most guilty of manslaughter, summarized the prosecution's case as a "retaliation killing." In closing argument, defense counsel also clarified the need to find an intent to kill under aiding and abetting law, stating: "The prosecutor has the burden of proving that this was a revenge killing and that [Petitioner] is guilty either directly as the shooter . . . or that he's an aider and abettor which means that he assisted the person who did the killing <u>with the knowledge that he was going to do the killing and with intent that he do the killing. And if he didn't have knowledge nor intent that the killing be done, then he is not an aider and abettor, he is not guilty.</u>"

<u>Id.</u> at *10 (emphasis in original).

The Court of Appeal also observed that "[n]o one argued that [Petitioner] acted with conscious disregard for human life in his actions toward Underwood." <u>Id.</u> at *11. In fact, "the prosecution argued repeatedly that [Petitioner] acted with the specific intent to kill." <u>Id.</u> And defense counsel "emphasized repeatedly that the jury had to decide that [Petitioner] intended to kill in order to find him guilty of manslaughter." <u>Id.</u>

Finally, the California Court of Appeal found that Petitioner's contentions were not credible in view of the overall evidence:

> [Petitioner's contentions] would have required the jury to believe that the day after Antron and Underwood attacked him, [Petitioner], although he merely sought recovery of his necklace and peaceful relations, and had a number of cars of his own, drove up to Antron and Underwood unannounced in a girlfriend's car accompanied by two gun-toting friends, obscured behind windows he had tinted that morning; that Mikey just happened to bring along the guns, including a MAC-style automatic weapon; that he, [Petitioner], who had sworn off guns after being declared a ward of the court for assault with a firearm some years before, knowingly drove with the guns in the car in violation of his parole without asking about, or noticing what was being done with them; that as soon as [Petitioner] drove up to the victims, Mikey just happened to don a disguise and shoot the MAC-style automatic weapon numerous times in Antron and Underwood's direction; that Antron just happened to be killed and Underwood shot a number of times while running away; and that [Petitioner]'s incriminating statements to police, which he made upon his own initiative, were coerced lies. Given the overwhelming evidence of [Petitioner]'s intent to kill and the incredible nature of his account, the jury could have had no reasonable doubt that [Petitioner] intended to kill Underwood. (Cf. Lee, supra, 43 Cal.3d at pp. 678-679

[quoting the appellate court that "'what we have here is a single story as to the objective facts, but a dispute over what this proves about . . . defendant's internal thoughts,'" and concluding, based upon the facts of the shooting, that "'no reasonable juror, properly instructed on the issue of intent, could have entertained a reasonable doubt'" that defendant had a specific intent to kill].)

Id. at *11 (footnote omitted).

The Court of Appeal also carefully addressed and rejected Petitioner's arguments as to why the trial court's error was not harmless.  In response to Petitioner's argument that "the jury's lengthy deliberations indicate that the case was close, hinging on the question of intent[,]" id. at *9, for example, the Court of Appeal observed:

Regarding the jury's 23 hours of deliberations over six days, this is not necessarily an extraordinarily lengthy period of time after 11 days of trial and closing arguments over numerous highly contested issues, and which deliberations included a 12-day recess in the middle. Regardless, the record, including the various jury questions, verdicts and period of deadlock, indicates that the jury took great care to examine the evidence and the law before reaching its verdicts in the face of the party's debate over numerous facts and charges, but it does not demonstrate that the jury would have found [Petitioner] not guilty of attempted voluntary manslaughter if the court had not erred in its instructions. (See e.g., People v. Avena (1996) 13 Cal.4th 394, 435-436 [rejecting the assumption that lengthy penalty deliberations indicated that the jury had difficulty reaching a decision]; People v. Brown (1985) 40 Cal.3d 512, 535 [rejecting the argument that the jury's lengthy deliberations indicated prejudice and noting "the jury may simply have sifted the evidence with special care"].)

Id. at *10.  And in response to Petitioner's argument that "the jury's acquittal of [him] for the specific intent crimes of murder and attempted murder suggest it did not think he acted with specific intent to kill," id. at *9, the Court of Appeal found:

. . . [T]he jury's acquittal of [Petitioner] of attempted murder and murder does not indicate it found he did not have a specific intent to kill. To the contrary, the jury, as it was instructed pursuant to CALJIC Nos. 8.10, 8.11, 8.30 and 8.31, could have found him guilty of second degree murder under an implied malice theory.  (See People v. Swain (1996) 12 Cal.4th 593, 599, 602-03 [second degree murder does not require a finding of a specific intent to kill].)

Id. at *10.

In view of the foregoing reasons and considerations, the Court of Appeal found "beyond a reasonable doubt that the trial court's instructional error regarding attempted voluntary manslaughter did not contribute to the jury's verdict and, therefore, was harmless [under the Chapman standard]." Id. at *12.

12

C.    **Pertinent Federal Law and Analysis**

In order to obtain federal habeas relief for errors in the jury charge, a petitioner must show that the ailing instruction so infected the entire trial that the resulting conviction violates due process. Estelle v. McGuire, 502 U.S. 62, 72 (1991). In making this determination, the error may not be judged in artificial isolation. Id. Instead, the error must be considered in the context of the instructions as a whole and on the overall trial record. Id. In other words, the court must evaluate erroneous jury instructions in the context of the overall charge to the jury as a component of the entire trial process. United States v. Frady, 456 U.S. 152, 169 (1982).

It is not enough that the court find constitutional error; it must also find that the error "had a substantial and injurious effect or influence in determining the jury's verdict" before it may grant federal habeas relief. California v. Roy, 519 U.S. 2, 4 (1996) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).

Here, the Court of Appeal found that the trial court's ambiguous  instructions on attempted voluntary manslaughter constituted error, but disposed of that error on harmless error grounds. This Court may not award habeas relief under § 2254 unless the state court's harmlessness determination was "contrary to," or amounted to an "unreasonable application" of clearly established federal law. 28 U.S.C. § 2254(d).

The Court of Appeal properly found that the error caused by the trial court's ambiguous instructions was subject to harmless error analysis because it amounted to no more than the error caused by instructions containing omissions or incorrect descriptions of elements. See Lara v. Ryan, 455 F.3d 1080, 1086 (9th Cir. 2006) (instructions containing omissions or incorrect descriptions of elements subject to harmless error analysis). Under Chapman v. California, 386 U.S. 18, 24 (1967), habeas relief is not warranted if any constitutional error is found to be harmless beyond a reasonable doubt, or harmless under an equivalent state law standard. The Court of Appeal's harmless error determination in this case was not "contrary to" established Supreme Court precedent because it

13

1  applied the correct standard under <u>Chapman</u> and did not conflict with any materially

2  indistinguishable Supreme Court cases. <u>See</u> <u>Medina v. Hornung</u>, 386 F.3d 872, 878 (9th Cir. 2004).

3  The Court of Appeal's harmless error determination did not amount to an "unreasonable

4  application" of the <u>Chapman</u> standard either.  After careful consideration, the Court of Appeal

5  concluded that the ambiguous instructions on attempted voluntary manslaughter were harmless in

6  light of the overwhelming evidence of Petitioner's intent to kill Underwood and various other

7  considerations.  Looking at the instructions in the context of the overall trial record, as we must, <u>see</u>

8  <u>Frady</u>, 446 U.S. at 196, it cannot be said that the state court's harmless error determination was

9  objectively unreasonable.  <u>See</u> <u>Medina</u>, 386 F.3d at 878.

10  The Court of Appeal properly found that ample evidence showed that Mikey and Petitioner

11  intended to kill Underwood.  Mikey shot at Antron and Underwood repeatedly; fired at Antron while

12  he lay on the ground; and then hunted Underwood as he fled for his life, striking him with bullets

13  in the shoulder and back.  Petitioner sought out Mikey after he was attacked by Antron, planning

14  to go to High Street to seek out Antron the next day;  borrowed a girlfriend's car and had the

15  windows tinted; traveled in said car with two guns to High Street; failed to do anything to interrupt

16  Mikey while he shot at Antron and Underwood; failed to attempt to aid the dying Antron, and

17  instead fled the scene; sought to conceal his role in the shooting by instructing his girlfriend to have

18  said car painted, which she did; lied to the police regarding his involvement in the shooting; and

19  essentially confessed to assisting Mikey in a plan to kill Antron and Underwood.

20  But the Court of Appeal did not base its harmlessness determination simply on there being

21  ample evidence to support a finding that Petitioner intended to kill Underwood.  The court properly

22  recognized that the <u>Chapman</u> standard requires more; a harmlessness determination under <u>Chapman</u>

23  requires a finding beyond a reasonable doubt that the trial court's ambiguous instructions did not

24  affect the jury's verdict.  <u>See</u> <u>Chapman</u>, 386 U.S. at 24.  The Court of Appeal based its determination

25  that the instructions on attempted voluntary manslaughter were harmless under <u>Chapman</u> on its

26

27

28                                                    14

1   finding that the jury convicted Petitioner of attempted voluntary manslaughter because the jury

2   believed that Petitioner intended to kill Underwood.

3         The Court of Appeal did not unreasonably determine that the instructions on attempted

4   voluntary manslaughter were harmless under Chapman because the court did not unreasonably find

5   that the jury convicted Petitioner of attempted voluntary manslaughter because the jury believed that

6   Petitioner intended to kill Underwood.  In support of its finding that the jury believed that Petitioner

7   intended to kill Underwood, the Court of Appeal relied on the ample evidence presented to the jury

8   showing that Petitioner intended to kill Underwood, the guilty verdict on count 3 (jury's finding that

9   Petitioner unlawfully owned, possessed and had custody and control of a handgun showed it rejected

10  Petitioner's story that he had nothing to do with the guns), the statements made by trial counsel (both

11  sides argued that the jury had to find that Petitioner intended to kill in order to find him guilty of

12  manslaughter and did not mention  a "conscious disregard for human life" theory) and its

13  observation that Petitioner's version of the facts was not credible in light of the overall evidence.

14  The state court reasoned that, when viewed together, these findings and considerations led it to

15  conclude that the jury convicted Petitioner of attempted voluntary manslaughter because it believed

16  that he had intended to kill Underwood.  While reasonable minds might disagree with the state

17  court's harmlessness determination, it cannot be said that it was objectively unreasonable.  See

18  Medina, 386 F.3d at 878.  Under the circumstances described above, the state court's decision is

19  entitled to "the benefit of the doubt."  Woodford v. Visciotti, 537 U.S. 19, 24 (2002).

20        Petitioner is not entitled to federal habeas relief on his attempted voluntary manslaughter

21  instructions claim because the state court's determination that any error was harmless cannot be said

22  was objectively unreasonable.  See Fry v. Pliler, 551 U.S. 112, 119 (2007) (federal court may not

23  award habeas relief under § 2254 unless state court's harmlessness determination was objectively

24  unreasonable); Ponce v. Felker, 606 F.3d 596, 606 (9th Cir. 2010) (same).

25

26

27

28                                                15

1

## II.    INSTRUCTION REGARDING NEW THEORY OF ACCOMPLICE LIABILITY

2    Petitioner claims that the trial court committed a federal constitutional error by improperly

3 supplying the jury a new and factually inapposite theory that permitted the jury to convict him on

4 the basis of natural and probable consequences doctrine.  Pet. at 36-50.  The claim is without merit

5 because it was not objectively unreasonable for the Court of Appeal to conclude that the trial court's

6 actions were proper under the circumstances, and that any error was harmless.

7 **A.    Background**

8    The Court of Appeal summarized the facts giving rise to this claim as follows:

9    During voir dire, the prosecution, in discussing the law of aiding and abetting, gave
the jury the example of Bonnie and Clyde robbing banks and sometimes shooting or
10   killing people, as portrayed in the 1960's film about the two. The prosecution asked
the jury if anyone would have a problem, under the theory of aiding and abetting,
11   convicting Bonnie and Clyde's getaway driver of robbery or murder.

12   Later, during its deliberations, the jury sent a note to the court as follows:

13   "Re CALJIC 3.01:

14   "For the bank robber question: (as asked in jury selection)

15   "If the driver knows they are off to rob a bank–we understand he's guilty of bank
robbery.
16
     "If someone is shot in the commission of the robbery, under what circumstances is the
17   driver guilty of aiding and abetting the shooting? (Example: driver knows there are
guns in the car.)
18
     "Possibly related question: re 1. 'with knowledge of the unlawful purpose of . . .'
19   What does it mean that it says 'the.' Don't most people have multiple purposes when
they are doing something? (Skip this one if irrelevant.)"
20
Crawford, 2006 WL 3493046, at *12.
21
        After discussing the jury's query about the bank robbery with counsel, the trial court noted
22
that it did not give CALJIC No. 3.02, the instruction regarding liability for natural and probable
23
consequences, which had been requested by Petitioner but not the prosecution, because the
24
prosecution had not proceeded on a theory that there was a predicate crime as required by the natural
25
and probable consequences doctrine.  Nevertheless, the trial court decided to respond to the bank
26
robber query by giving a modified version of CALJIC No. 3.02, specifying that it relates only to
27

28                                                    16

their question and not to the facts of the case.  The court's written response to the jury was as

follows:

> "You have submitted an inquiry which refers to the 'bank robber question' posited during jury selection. I shall answer the question as it relates to the question you submitted, but be advised that the factors in that question are distinct and distinguishable from the facts in this case.
>
> "The jury has asked whether the driver of a vehicle used to transport the individuals intending to commit a robbery is guilty of aiding and abetting a shooting, should the shooting occur during the commission of the robbery. It is understood that the driver was aware that the coparticipants intended to commit the robbery.
>
> "Under this set of facts, the driver is guilty of aiding and abetting the shooting if the shooting was a natural and probable consequence of the commission of the crime of robbery.
>
> "In determining whether a consequence is 'natural and probable,' you must apply an objective test, based not on what the defendant actually intended, but on what a person of reasonable and ordinary prudence would have expected likely to occur. The issue is to be decided in light of all the circumstances surrounding the incident. A 'natural' consequence is one which is within the normal range of outcomes that may be reasonably expected to occur if nothing unusual has intervened. 'Probable' means likely to happen."

Id. at *13.

On the morning of the next day of deliberation, the jury foreperson – at the bequest of the

entire jury – met with the court (with counsel for the parties present) to seek its advice on what the

jury could do to reach a verdict on the first to counts, regarding the shooting of Antron and

Underwood.  As soon as the bank robber example came up, the court specifically asked the

foreperson that the jury not use the analogy of the bank robber in its deliberations because it is so

"factually inapposite, not relevant, nonrelevant to the facts of this case that it may in fact be

confusing." Id. at *14.

**B.     Court of Appeal's Opinion**

The Court of Appeal found that the trial court's response to the jury's bank query was within

its discretion:

> A court's obligation to respond to jury questions during deliberation is governed by section 1138, which states in relevant part: "After the jury have retired for deliberation, . . . if they desire to be informed on any point of law arising in the case,

17

. . . the information required must be given. . . ." (§ 1138.) According to our Supreme Court, this language "imposes on the court the 'primary duty to help the jury understand the legal principles it is asked to apply.'" ( People v. Cleveland (2004) 32 Cal.4th 704, 755, quoting People v. Beardslee (1991) 53 Cal.3d 68, 97.) "Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information. [Citation.] Indeed, comments diverging from the standard are often risky. [Citation.] The trial court [may be] understandably reluctant to strike out on its own. But a court must do more than figuratively throw up its hands and tell the jury it cannot help. It must at least <u>consider</u> how it can best aid the jury. It should decide as to each jury question whether further explanation is desirable, or whether it should merely reiterate the instructions already given." (People v. Beardslee, supra, at p. 97.)

Furthermore, "[t]he general rule is that in a criminal case the trial court must instruct on the 'principles of law relevant to the issues raised by the evidence [citations] and has the correlative duty "to refrain from instructing on principles of law which not only are irrelevant to the issues raised by the evidence but also have the effect of confusing the jury or relieving it from making findings on relevant issues." [Citation.]' [Citation.]" ( People v. Mobley (1999) 72 Cal.App.4th 761, 781, quoting People v. Saddler (1979) 24 Cal.3d 671, 681.)

With these standards in mind, we analyze the court's actions here. The trial court was confronted with a query indicating that the jury was considering an inapposite bank robber scenario. The court appropriately responded that the facts of that scenario were "distinct and distinguishable" from those before the jury, and in its discretion decided to explain why by outlining the law that applied there, which was not a part of its instructions in the present case. The court pointed out that the driver of the robbers' car could be guilty of aiding and abetting the shooting if the shooting was a natural and probable consequence of the commission of the crime of robbery, and explained the natural and probable consequence doctrine. While the court used certain language that normally is found in a jury instruction (i.e., "you must apply an objective test . . ."), it made clear that the bank robber scenario was based on inapposite facts, and that the law it was citing related <u>only</u> to the bank robber analogy, <u>not</u> the present case. Contrary to [Petitioner]'s characterization, the court did not instruct the jury to apply the natural and probable consequences doctrine to this case. Rather, the court referred to that doctrine as part of its explanation of why the scenario should <u>not</u> be analogized to the present case.

Notably, [Petitioner] does not contend that the court's statement of the law was itself incorrect. We are again presented with an argument that in effect contends that the court unnecessarily confused the jury in the course of correctly stating certain legal principles. We disagree that the court did so. Although generally, a court should not instruct on inapposite legal principles ( People v. Mobley, supra, 72 Cal.App.4th at p. 781), the court response here was reasonable in light of the dilemma confronting it. The bell having already been rung (the jury's contemplation of an inapposite scenario), the court determined that the best way to guide the jury away from its reverberating sound included explaining the law that applied to the bank robber scenario. The court had the discretion to do so.

<u>Id.</u> at **14-15 (emphasis in original).

1    The Court of Appeal also found that any error was harmless, whether analyzed under the

2  federal "harmless beyond a reasonable doubt" or state "reasonable probability" standard. Id. at *15.

3  The court explained:

> 4    Although not raised by the parties, the record indicates that the court's written
> response successfully diverted the jury from the inapposite bank robber scenario.
> 5    When the foreperson subsequently met with the court and counsel in chambers, he
> stated that "we would like to return back to the example . . ., the bank robber. We
> 6    would like to talk about the bank robber . . . ." (Italics added.) When the court again
> indicated that the bank robber scenario was inapposite, the foreperson said, "[g]ee,
> 7    we found it helpful," and later indicated that "we used it" in a limited way relating
> to the issue of aiding and abetting. The foreperson then stated that the court's
> 8    previous response "sort of paraphrased the law a little bit, you filled in a few of the
> gaps in that statement. We read it over and over and found it to be helpful ." Read
> 9    together, these remarks indicate that the jury had considered the scenario in its
> deliberations before receiving the court's response, had reviewed the court's
> 10   response repeatedly and found it helpful, and had stopped talking about the bank
> robber scenario and wanted to return back to it, a request that the court properly
> 11   denied. In other words, the record makes it self-evident that any "error" by the court
> was harmless.

12

> 13   Second, the court's subsequent oral instruction to the foreperson that the bank
> robber scenario should not be considered and to inform the jury of this cured any
> 14   remaining confusion to which the court may have previously contributed. While
> [Petitioner] makes much of the court's final comment to the foreperson that the
> 15   bank robber scenario went "solely to the issue of aiding and abetting," argued that
> this "cemented its relevance" in the foreperson's mind, this comment did nothing
> 16   to alter the court's instruction that the scenario did not apply to this case and should
> not be used. We also must presume that the foreperson related the instruction to the
> 17   jury and that the jury followed it, as [Petitioner] provides no evidence to the
> contrary.  (Romo v. Ford Motor Co. (2002) 99 Cal.App.4th 1115, 1135 ["absent
> 18   evidence to the contrary, a jury is presumed to follow the instructions of the trial
> court"], disapproved on other grounds as stated in People v. Ault (2004) 33 Cal.4th
> 19   1250, 1272 .) It was only after the court's discussion with the foreperson that the
> jury overcame its apparent stalemate and returned with its verdicts. Thus, the record
> 20   strongly indicates that the court took steps which remedied any "error" that it might
> have previously made in its written response to the jury.

21  Id. at *16 (emphasis in original) (footnotes omitted).

22  **C.    Pertinent Federal Law and Analysis**

23    Petitioner may be correct in arguing that a constitutional violation occurs when a defendant

24  is "ambushed" with a new theory of liability in the jury instructions after the close of evidence, but

25  the record here makes clear in that the natural and probable consequences doctrine was not included

26  in the trial court's instructions to the jury.  In fact, it was quite the opposite – the trial court

27

28                                              19

admonished the jury that the natural and probable consequences doctrine was distinct and distinguishable from this case, and that the bank robber analogy should not be used in its deliberations. It simply cannot be said that the Court of Appeal's determination that the trial court did not instruct the jury to apply the natural and probable consequences doctrine to this case involved an unreasonable determination of the facts in light of the evidence presented in the trial court proceeding. See 28 U.S.C. § 2254(d)(2).

Nor can it be said that the Court of Appeal's determination that any error was harmless amounted to an objectively unreasonable application of the pertinent federal "beyond a reasonable doubt" standard. See 28 U.S.C. § 2254(d)(1); Fry v. Pliler, 551 U.S. 112, 119 (2007) (federal court may not award habeas relief under § 2254 unless state court's harmlessness determination was objectively unreasonable). The specific admonishment the trial court gave to the jury to disregard the inapposite bank robber scenario makes clear that it was not objectively unreasonable for the Court of Appeal to determine that the trial court's response to the jury's bank robber query was harmless beyond a reasonable doubt. It also makes clear that it cannot be said that the trial court's alleged error has a substantial and injurious effect or influence in determining the jury's verdict. See id. at 121-22 ("substantial and injurious effect" standard set forth in Brecht v. Abrahamson, 507 U.S. 619 (1993), must be met in order to grant federal habeas relief for trial court error, whether or not the state appellate court recognized the error and reviewed it for harmlessness under the "harmless beyond a reasonable doubt" standard set forth in Chapman v. California, 386 U.S.18 (1967)). Petitioner is not entitled to federal habeas relief on his new theory of accomplice liability instruction claim.

1

**III.    SPEAKING WITH FOREPERSON IN ABSENCE OF COMPLETE JURY**

2

Petitioner claims that the trial court violated California Penal Code section 1138[1] and his

3

federal constitutional rights by meeting with just the jury foreperson and counsel in chambers, rather

4

than providing any requested supplemental instructions to the entire jury in open court.  Pet. at 58.

5

The claim is procedurally defaulted or, alternatively, without merit.

6

**A.    Court of Appeal's Opinion**

7

The Court of Appeal found that "[b]y consenting to the trial court's discussion with the

8

foreperson outside the presence of the remaining jurors, [Petitioner] has forfeited his claim on appeal

9

that the trial court's actions violated section 1138." Crawford, 2006 WL 3493046, at *16 (citations

10

omitted).

11

And even if he had not forfeited his claim, the court found that Petitioner was not prejudiced

12

by any purported error by the trial court.  Id. at *17.  The court explained:

13

14

15

16

. . . In light of the court's previous instruction that the bank robbery scenario was inapposite to the case at hand, the foreperson's statements indicating that the jury had stopped using the scenario after receiving the court's previous written response, and the court's verbal instruction to the foreperson not to return to the scenario and to so inform the jury, any error was harmless under either the federal and state standards.  (See Chapman v. California, supra, 386 U.S. at p.24 [federal]; People v. Watson, supra, 46 Cal.2d at p. 836 [state].)

17

18

19

20

[Petitioner argues that we must find prejudice because we cannot know whether the jury foreperson accurately related the court's verbal instructions to the jury. [Petitioner] ignores our duty to presume that the jury followed the court's instructions in the absence of evidence to the contrary.  (Romo v. Ford Motor Co., supra, 99 Cal.App.4th at p. 1135.)  Regardless, as we have already discussed, the court's exchange with the foreperson was only one of

21

22

[1]Section 1138 provides in relevant part:

23

24

25

26

After the jury have retired for deliberation, . . . if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court.  Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called.

27

28

a series of events which leads us to conclude that any error was harmless beyond a reasonable doubt.

Id.

**B.    Pertinent Federal Law and Analysis**

The Ninth Circuit has repeatedly held that California's contemporaneous objection rule, which requires objection at time of trial to preserve an issue for appeal, is an adequate procedural bar to federal habeas review.  See Inthavong v. Lamarque, 420 F.3d 1055, 1058 (9th Cir. 2005); Paulino v. Castro, 371 F.3d 1083, 1092-93 (9th Cir. 2004); Davis v. Woodford, 384 F.3d 628, 653-54 (9th Cir. 2004); Vansickel v. White, 166 F.3d 953, 957-58 (9th Cir. 1999).  The California Court of Appeal's invocation of the contemporaneous objection rule here accordingly precludes federal review of Petitioner's claim unless Petitioner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claim will result in a fundamental miscarriage of justice.  See Coleman v. Thompson, 501 U.S. 722, 750 (1991).  Petitioner makes no such showing.  His claim is barred from federal habeas review.  See Davis, 384 F.3d at 653-54 (finding Sixth Amendment claim procedurally barred where state appellate court found claim waived because petitioner failed to raise it below).

Even if not procedurally defaulted, the claim would fail on the merits because the Court of Appeal's harmlessness determination cannot be said to be objectively unreasonable.  See 28 U.S.C. § 2254(d); Fry, 551 U.S. at 119 (federal court may not award habeas relief under § 2254 unless state court's harmlessness determination was objectively unreasonable).  For essentially the same reasons as those noted by the Court of Appeal, it simply cannot be said that the trial court's purported error in speaking with the foreperson outside the presence of the entire jury had a substantial and injurious effect or influence in determining the jury's verdict.  See Brecht, 507 U.S. at 637.  Petitioner is not entitled to federal habeas relief on his speaking to the foreperson outside the presence of the jury claim.

**CONCLUSION**

22

1       After careful consideration of the record and relevant law, the Court is satisfied that the

2   petition for a writ of habeas corpus must be DENIED.

3       Pursuant to Rule 11 of the Rules Governing Section 2254 Cases, a certificate of

4   appealability (COA) under 28 U.S.C. § 2253(c) is granted as to Petitioner's attempted

5   voluntary manslaughter jury instructions claim.  But a COA is DENIED as to his other

6   claims because he has not demonstrated that "reasonable jurists would find the district court's

7   assessment of [those] constitutional claims debatable or wrong."  Slack v. McDaniel, 529

8   U.S. 473, 484 (2000).

9       The clerk shall enter judgment in favor of respondent and close the file.

10      SO ORDERED.

11

12  DATED:  July 13, 2010                    _____
                                            CHARLES R. BREYER
13                                          United States District Judge

14

15

16                                  G:\PRO-SE\CRB\HC.08\Crawford, D1.merits.wpd

17

18

19

20

21

22

23

24

25

26

27

28